IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 1, 2023

## TORI SHANNON (BARNES) COLE v. SKIN RN AESTHETICS, LLC ET AL.

**Appeal from the Circuit Court for Davidson County**
No. 16C2055    Kelvin D. Jones, Judge
_____

**No. M2022-01555-COA-R3-CV**
_____


An employer called the police after finding company property in an employee's purse. The employee was arrested and charged with felony theft of property. She was later acquitted. After the acquittal, the employee sued her former employer for malicious prosecution. A jury found the employer liable for malicious continuation of the criminal proceedings. Because there is material evidence in the record to support the jury verdict, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which THOMAS R. FRIERSON II and KENNY W. ARMSTRONG, JJ., joined.

Howard B. Jackson, Knoxville, Tennessee, for the appellants, Skin RN Aesthetics, LLC, and Christy Taylor.

Benjamin Lewis and Brock East, Murfreesboro, Tennessee, for the appellee, Tori Shannon Cole.


**OPINION**

**I.**

**A.**

Shannon Cole is a registered nurse trained in aesthetics. She is also certified to perform laser treatments and Botox injections. In the fall of 2014, she closed her permanent makeup business and went to work part-time for Skin RN Aesthetics, LLC, a medical spa that offered nonsurgical cosmetic procedures. According to Christy Taylor, the spa's

owner, various inventory supplies began disappearing after Mrs. Cole joined the staff. Mrs. Taylor immediately suspected her new employee. But she had no proof.

On November 26, Mrs. Taylor noticed two vials of Botox were missing. On a hunch she decided to check Mrs. Cole's purse, which was hanging in the office. Mrs. Taylor described the purse as "bulging open because it was stuffed with product." She could easily see the two missing vials of Botox. Searching further, she also found "aesthetic wipes, syringes, saline"—all the products necessary to administer Botox—and a loaded handgun. Feeling that her suspicions were confirmed, Mrs. Taylor snapped a picture with her phone. She shared her discoveries with the office manager and Heather Hull, her half-sister and Skin RN's lead aesthetician.[1] And she directed the office manager to contact the police.

Mrs. Cole was arrested and charged with felony theft of property. *See* Tenn. Code Ann. §§ 39-14-103, -105 (2018). Although she was indicted by a grand jury, she was acquitted at trial.

B.

After the acquittal, Mrs. Cole sued Mrs. Taylor and Skin RN for malicious prosecution. Mrs. Taylor and Skin RN counterclaimed, seeking $13,858 in damages for conversion of personal property.

At trial, Mrs. Cole insisted that the criminal proceedings against her were unjustified. As she explained, the staff had previously discussed offering offsite Botox parties. And on the morning of November 26, her mother had agreed to host a party with other family members over the Thanksgiving holiday. After seeing a scheduled client that morning, Mrs. Cole began to gather the necessary supplies for the party. She placed a 50-unit vial and a 100-unit vial of Botox in her purse. According to Mrs. Cole, Skin RN purchased Botox in 100-unit vials. But the manufacturer also sent free 50-unit vials, typically designated for employee use.[2] Before Mrs. Cole could discuss her plans with Mrs. Taylor and obtain the necessary consent forms, the office manager asked her to see a walk-in client. As Mrs. Cole was finishing up the client, Mrs. Taylor called her into the office. Two police officers were waiting.

According to Mrs. Cole, the officers immediately patted her down and handcuffed her. Mrs. Taylor told her she was going to jail for theft. The officers examined the contents of Mrs. Cole's purse. Mrs. Cole explained she had a permit for the handgun and that the Botox was for an upcoming offsite party.

---

[1] At trial, these employees did not recall seeing any aesthetic wipes, syringes, or saline in the purse.

[2] The office manager confirmed that Skin RN did not pay for the 50-unit vials of Botox.

Mrs. Taylor insisted that several other items in Mrs. Cole's purse and car belonged to Skin RN. Mrs. Cole denied these claims. She said that she received the product samples in an employee gift bag. And the saline and syringes in her car were part of the leftover inventory from her former business. After checking with the lead aesthetician, Mrs. Taylor conceded that the product samples were not stolen.

The officers also questioned Mrs. Cole about some missing cash. Mrs. Cole agreed that she saw some cash in her treatment room that morning. Assuming it was a leftover tip for the previous aesthetician, she moved it to a shelf. When the office manager went to verify Mrs. Cole's story, she found the cash in the described location. It was later revealed that the office manager and the lead aesthetician intentionally left the money in the treatment room that morning as bait.

Mrs. Taylor's version of events differed from Mrs. Cole's version. In her telling, she claimed that the officers questioned Mrs. Cole extensively before they made the arrest. Although she heard Mrs. Cole's explanation for the Botox in her purse, she did not find it credible. She did not recall any discussions in the office about Botox parties. And she never gave Mrs. Cole permission to conduct one on behalf of Skin RN. For an extended period, Mrs. Cole repeatedly denied the theft accusation. Frustrated, Mrs. Taylor interjected that she had proof on video. Only then did Mrs. Cole tearfully confess to having stolen the missing products to do offsite treatments for her friends and family. After the confession, the officers placed Mrs. Cole under arrest.

At trial, Mrs. Taylor readily admitted that she lied about having a video. Still, she felt she had ample proof to support her belief that Mrs. Cole was guilty. She claimed she had been tracking her inventory since mid-October. She took daily pictures of the more expensive products, such as Botox and Juvederm. And she asked her office manager to run frequent inventory reports.

Yet the only evidence Mrs. Taylor produced at trial was a picture of the two vials of Botox in Mrs. Cole's purse and a spreadsheet purporting to list the stolen items. She acknowledged that she directed her staff to create the spreadsheet after Mrs. Cole's arrest. She claimed the prosecutor asked her to provide "something showing what was missing and a quantity and an amount." Using the spa's point-of-sale software, the office manager compared the amounts of Botox and Juvederm purchased during Mrs. Cole's tenure with the amount of documented use during that same period. She determined that 13 vials of Botox[3] and 23 syringes of Juvederm were missing—a total value of $12,542. The lead aesthetician quantified the other missing items, such as cleansers, lotions, masks, and

---

[3] This total included the two vials found in Mrs. Cole's purse. Mrs. Taylor testified that those two vials could no longer be used because Mrs. Cole had not stored them properly.

syringes. Based on these calculations, the spreadsheet indicated that the "grand total of stolen goods" was $13,858.

Mrs. Taylor was subpoenaed to testify at the preliminary hearing. She also testified before the grand jury and at trial. Although the spreadsheet was used against Mrs. Cole during the criminal proceedings, Mrs. Taylor admitted at the malicious prosecution trial that she had no tangible proof that Mrs. Cole had stolen the items on the list. The jury would just have to take her word for it.

## C.

The jury verdict was mixed. The jury rejected Mrs. Cole's claim that Mrs. Taylor initiated criminal proceedings against her without probable cause. But it found Mrs. Taylor liable for the malicious continuation of the prosecution. Specifically, it found that Mrs. Taylor "took an active part in the continuation of the prosecution after learning that there was no probable cause for believing Shannon Cole was guilty of the charges." And it awarded Mrs. Cole $325,000 in compensatory damages.

After the court entered a judgment on the verdict, the defendants moved for a judgment notwithstanding the verdict.[4] *See* TENN. R. CIV. P. 50.02. They argued that there was no material evidence to support the jury's finding that Mrs. Taylor was liable for malicious continuation. The court denied the motion.

## II.

## A.

The defendants raise two related issues on appeal. They contend that the trial court erred in denying their Rule 50.02 motion. And they insist that there is no material evidence to support the jury's finding of liability.

We treat a motion for judgment notwithstanding the verdict the same as a motion for a directed verdict. *Holmes v. Wilson*, 551 S.W.2d 682, 685 (Tenn. 1977). The appeal of a motion for a directed verdict requires this Court to decide whether the non-moving party presented enough material evidence to create an issue of fact for a jury to resolve. *Burton v. Warren Farmers Coop.*, 129 S.W.3d 513, 520 (Tenn. Ct. App. 2002). Directed verdicts are appropriate when reasonable minds could reach only one conclusion from the evidence. *Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn. 2000). "A case should go

---

[4] The defendants preserved their right to seek a judgment as a matter of law by filing a motion for directed verdict at the close of the plaintiff's proof and renewing the motion at the end of trial. *See In re Est. of Link*, 542 S.W.3d 438, 454 (Tenn. Ct. App. 2017).

to the jury, even if the facts are undisputed, when reasonable persons could draw conflicting conclusions from the facts." *Richardson v. Miller*, 44 S.W.3d 1, 30 (Tenn. Ct. App. 2000). But the conclusions cannot be based on "speculation, conjecture, and guesswork." *Id.*

We will set aside a jury's findings "only if there is no material evidence to support the verdict." TENN. R. APP. P. 13(d). Whether evidence is material has nothing to do with its weight. *Kelley v. Johns*, 96 S.W.3d 189, 194 (Tenn. Ct. App. 2002). "Material evidence" is evidence "which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case." *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 422 (Tenn. 2013) (quoting *Knoxville Traction Co. v. Brown*, 89 S.W. 319, 321 (Tenn. 1905)). In a material evidence review, we do not weigh the evidence or re-evaluate witness credibility. *Grissom v. Metro. Gov't of Nashville, Davidson Cnty.*, 817 S.W.2d 679, 684 (Tenn. Ct. App. 1991). We take the strongest legitimate view of the evidence supporting the verdict, including all reasonable inferences, assume the truth of the supporting evidence, and discard all contrary evidence. *Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978). If there is any material evidence to support the verdict, we must affirm. *Id.*

### B.

Our supreme court has recognized that even if a defendant had "probable cause to initiate criminal charges, there can be liability for the malicious continuation of a criminal proceeding." *Pera v. Kroger Co.*, 674 S.W.2d 715, 722 (Tenn. 1984). A private party "who takes an active part in continuing or procuring the continuation of criminal proceedings initiated by himself or by another is subject to the same liability for malicious prosecution as if he had then initiated the proceedings." RESTATEMENT (SECOND) OF TORTS § 655 (AM. L. INST. 1977).

For liability to attach, the defendant "must have some control over the prosecution." *Pera*, 674 S.W.2d at 722. As a general rule, private parties do not control criminal prosecutions. *Id.* at 723. Prosecutions are "left in the hands of the District Attorney and of the Court." *Id.* To establish the requisite control, the plaintiff must show that the defendant actively participated in the criminal prosecution. *See id.* at 722-23; RESTATEMENT (SECOND) OF TORTS § 655 cmt c. Merely appearing as a witness for the prosecution is not active participation, even if the witness gave false testimony. *Pera*, 674 S.W.2d at 724; RESTATEMENT (SECOND) OF TORTS § 655 cmt. c. More is required. For example, liability can be based on proof that the defendant urged or pressured the prosecutor to "proceed against his own advice or judgment." *Pera*, 674 S.W.2d at 723; *see also* RESTATEMENT (SECOND) OF TORTS § 655 cmt c.

The defendants contend that there is no evidence of active participation here under the analysis in *Pera v. Kroger Co.* We agree that there is no proof that Mrs. Taylor urged

or pressured the prosecutor to continue the criminal proceedings. Mrs. Cole does not argue otherwise. Instead, she urges this Court to affirm the jury verdict because Mrs. Taylor "provided false information to the police and to the prosecutors in a blatant effort to continue the prosecution."

Ordinarily, a private party cannot be held liable for malicious prosecution solely for providing information to the police or prosecutor. *Wykle v. Valley Fid. Bank & Tr. Co.*, 658 S.W.2d 96, 98 (Tenn. Ct. App. 1983); RESTATEMENT (SECOND) OF TORTS § 653 cmt. g (AM. L. INST. 1977). "[O]nly the District Attorney General can make the decision whether to proceed with a prosecution for an offense committed within his or her district." *Ramsey v. Town of Oliver Springs*, 998 S.W.2d 207, 209 (Tenn. 1999); *see also State v. Welch*, 595 S.W.3d 615, 630-31 (Tenn. 2020) (discussing prosecutorial discretion); *Pera*, 674 S.W.2d at 723. The exercise of prosecutorial discretion shields the private informant from liability even if the information "led the officer to initiate the proceedings." RESTATEMENT (SECOND) OF TORTS § 653 cmt. g (AM. L. INST. 1977).

But our courts have recognized that a private party who knowingly gives false or misleading information to the prosecutor with an improper motive may be liable for malicious prosecution. *See Kauffman v. A. H. Robins Co.*, 448 S.W.2d 400, 403 (Tenn. 1969); *Gordon v. Tractor Supply Co.*, No. M2015-01049-COA-R3-CV, 2016 WL 3349024, at *6 (Tenn. Ct. App. June 8, 2016). The knowing provision of false information effectively prevents "an intelligent exercise of the [prosecutor's] discretion." RESTATEMENT (SECOND) OF TORTS § 653 cmt. g. If the false information caused the prosecutor to start criminal proceedings against the accused, the informant may be held liable for the consequences. *Id.*; *Gordon*, 2016 WL 3349024, at *5.

The defendants argue that recognition of this basis for liability runs counter to the *Pera* decision. We do not read the decision so narrowly. In *Pera*, the supreme court explained that malicious continuation of a criminal proceeding "*usually* involve[s] conduct such as urging a prosecutor to proceed against his own advice or judgment." *See P*era, 674 S.W.2d at 723 (emphasis added). But the decision does not foreclose the possibility that other conduct could also lead to liability. A defendant who procures the continuation of a criminal prosecution by knowingly feeding the prosecutor false or misleading information has exercised "some control over the prosecution." *See Pera,* 674 S.W.2d at 722. In our view, such conduct may satisfy the *Pera* requirement. *But see Gordon*, 2016 WL 3349024, at *9 (distinguishing the *Pera* decision).

The current version of the Restatement of Torts offers an understanding of malicious prosecution similar to our own. *See* RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 21 cmt. e (AM. L. INST. 2020). The comments suggest a plaintiff may prove liability for continuing a criminal prosecution with evidence that the defendant "urged that the prosecution be continued or insisted on it (when the prosecutor was not inclined to proceed), or knowingly or recklessly provided false information that caused the

6

prosecution to go on."[5]  *Id.*; *see, e.g., Pierce v. Gilchrist*, 359 F.3d 1279, 1292 (10th Cir. 2004) (holding that forensic chemist could be liable for continuing malicious prosecution if the plaintiff established that the prosecutor decided to press forward with the criminal case based on false or misleading information provided by forensic chemist).

Taking the strongest legitimate view of the evidence supporting the verdict, we conclude that the jury could find that Mrs. Taylor procured the continuation of the criminal prosecution by knowingly or recklessly providing false or misleading information that caused the prosecutor to move forward with the criminal proceedings.  After the arrest, Mrs. Taylor gave the prosecutor a spreadsheet purporting to show a grand total of $13,858 in "stolen goods."  Yet she had no proof that Mrs. Cole had stolen these products.  Although Mrs. Taylor claimed that Mrs. Cole confessed to stealing the missing inventory, the jury heard two different versions of the police interrogation.  The jury was free to believe one witness and not another.  *See Ferguson v. Middle Tenn. State Univ.*, 451 S.W.3d 375, 383 (Tenn. 2014) ("The jury can disregard the testimony of a witness it does not find to be credible.").  There was also testimony that Skin RN did not have any inventory controls at that time.  All employees had access to these products for both business and personal use. Mrs. Taylor admitted that Skin RN hosted employee Saturdays, during which the employees performed cosmetic procedures on each other.  And Mrs. Cole testified that the employees did not document their personal use.

C.

The defendants also contend that there was no material evidence to support the jury's finding that Mrs. Taylor procured the continuation of the criminal proceeding "after learning that there was no probable cause for believing Shannon Cole was guilty of the charges."  Probable causes exists when the "facts and circumstances [are] sufficient to lead an ordinarily prudent person to believe the accused was guilty of the crime charged." *Roberts v. Fed. Exp. Corp.*, 842 S.W.2d 246, 248 (Tenn. 1992) (citation omitted); RESTATEMENT (THIRD) OF TORTS: LIAB. FOR ECON. HARM § 22 (AM. L. INST. 2020).  If "reasonable minds can differ as to the existence of probable cause[,] a jury is to decide the issue."  *Roberts*, 842 S.W.2d at 249.

When we view the evidence in Mrs. Cole's favor, including all reasonable inferences, and disregard all contrary evidence, we find material evidence to support the jury's finding.  On November 26, Mrs. Taylor noticed that two vials of Botox were missing. She found the missing vials in Mrs. Cole's bag along with a loaded handgun.  So she directed her office manager to call the police.  And the jury found Mrs. Taylor had probable

---

[5] Recognizing the nature of Restatements, we cite to the comments only as a secondary legal source to illustrate that malicious continuation of a criminal proceeding is not limited to urging a prosecutor to proceed.  *See* Shyamkrishna Balganesh, *Relying on Restatements*, 122 COLUM. L. REV. 2119, 2127 (2022).

7

cause to do so. Even so, the jury could also believe that probable cause disappeared after Mrs. Cole gave a reasonable explanation for her conduct. Other witnesses confirmed that offsite Botox parties had been discussed. Mrs. Cole reportedly intended to ask for Mrs. Taylor's approval before she left that day. And she still had time to do so. The lead aesthetician confirmed that the product samples were a gift. The office manager found the "missing cash." And the generic items found in Mrs. Cole's car could have been leftover inventory from her makeup business.

Without the alleged confession, there was no proof to connect Mrs. Cole to the missing inventory items. So Mrs. Taylor had no objective reason to continue to believe that Mrs. Cole was guilty of theft. *See Roberts*, 842 S.W.2d at 247, 249 (concluding that reasonable minds could differ as to whether there was probable cause to charge employee with theft based on employee's testimony that he never intended to steal anything; rather, he simply forgot to return the items found in his pockets).

## III.

Because the jury verdict is supported by material evidence, the trial court properly denied the defendants' Rule 50.02 motion. We affirm the judgment.

       s/ W. Neal McBrayer
       W. NEAL MCBRAYER, JUDGE